If we compare the above drawing with the drawing herein before inserted of the patent in suit, it is quite evident we think that the outer tubes of the defendant's radiator are $B$ $B'$ $C$ $C'$ of the patent in suit; that the tubular passageway cut through the intersecting tubes and made steam tight by the tubular bosses is cross-tube $E$ of the patent in suit; that the remaining tubes are concededly radiating tubes, arranged in panels in series, and, since it does not seem to be disputed that they are smaller than $B$ $B'$ $C$ $C'$ and $E$, they are the tubes $D$ of the patent.

In conclusion it may be remarked that the defendant's own conduct seems to indicate that it is fully aware of the meritorious character of the complainant's invention in making these panel series of small diameter. If there be no merit in these relative proportions, as defendant contends, it impresses us as strange that defendant insists on making its series of radiating tubes of smaller diameter than the $B$, $C$, etc., of the patent.

The decree is reversed, with the direction to grant a perpetual injunction as prayed, and that an accounting be had as to claims 1 and 2 of the patent in suit which we hold infringed by the defendant company, and that the complainant recover its costs.

---

WALLERSTEIN et al. v. S. LIEBMANN'S SONS BREWING CO.

(Circuit Court of Appeals, Second Circuit.  May 27, 1914.)

No. 294.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF TREATING BEER.
    The Wallerstein patents, No. 995,820, for beer and method of preparing same, and No. 995,824, for method of treating beer or ale, the process being for the purpose of making beer chill-proof and stable, *held* not anticipated, valid, and infringed.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit by Max Wallerstein and Leo Wallerstein against the S. Liebmann's Sons Brewing Company. Decree for complainants, and defendant appeals. Affirmed.

The following is the statement of facts and opinion of the District Court, by Veeder, District Judge:

Action by Max Wallerstein and Leo Wallerstein, trading as a copartnership under the name of American Burtonizing Company, against S. Liebmann's Sons Brewing Company, for infringement of letters patent No. 995,820, for beer and method of preparing same, granted to Leo Wallerstein June 20, 1911, and of letters patent No. 995,824, for method of treating beer or ale, granted to Leo Wallerstein on the same date.

The claims of patent No. 995,820 relied upon are:

"1. As a new article of manufacture, a beer or ale characterized by its capability of remaining clear when chilled subsequent to pasteurization, by its high degree of stability at ordinary temperatures, and by the presence therein, in the described state of activity, of a proteolytic enzym active in slightly acid media.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"2. In the art of brewing, the step which consists in adding to the beer or ale, subsequent to the cooling of the wort, a proteolytic enzym active in slightly acid media, such enzym being added in proportions and under conditions to remain in the finished beer in the described state of activity, and to render the beer chill-proof and more stable at ordinary temperatures.

"3. In the art of brewing, the step which consists in adding to the beer or ale, subsequent to the cooling of the wort, a proteolytic enzym active in slightly acid media, such enzym being added in proportions and under conditions to remain in the finished beer in the described state of activity and to render the beer chill-proof and more stable at ordinary temperatures, and subsequently pasteurizing."

The claims of patent No. 995,824 relied upon are:

"1. In the art of brewing, the step which consists in adding to beer or ale, before bottling, a proteolytic enzym derived from the gastric secretions of mammals.

"2. In the art of brewing, the step which consists in adding to beer or ale a proteolytic enzym derived from the gastric secretions of mammals, and subsequently pasteurizing."

The development of the bottling industry brought about a change in the method of consumption of beer. Instead of being served from the keg, or at all events within a short time after leaving the brewery, it was shipped long distances and kept for considerable periods of time. When thus kept, even at ordinary temperatures, beer tends, from a lack of stability, to become hazy and cloudy, and to deposit a sediment. But in this country it is customary to drink bottled beer very cold. This chilling causes brilliant beers or sparkling ales to lose their brilliancy and to become hazy and cloudy. It was soon found that under conditions of long shipment and storage the most carefully brewed beer developed micro-organic growths. To eliminate this brewers adopted the practice of pasteurization; that is, the beer in bottles was subjected to a temperature or from 140° to 150° F. for about half an hour. But while pasteurization prevented the growth of micro-organisms, pasteurized beer was found to be particularly sensitive to cold and unstable. There remain in the beer after steaming certain substances of an albuminous nature, which, while invisible at the time of steaming because dissolved, are slowly affected by a number of causes and become less readily soluble, especially at low temperatures, finally causing haziness or sedimentation and thus rendering the beer unsightly and unpresentable.

The production of stable and chill-proof beer was therefore a problem of vital importance to brewers. The evidence leaves no doubt of the reality of the problem or of the difficulty involved in its solution. What is the cause of the precipitation of albuminoids in finished bottled beer, despite normal treatment in brewhouse and cellar? Is the precipitation due to chemical or mechanical causes, or is it to the result of enzym action? All the technical skill of the trade was directed to these questions. It came to be generally assumed that the failure to produce chill-proof and stable beer was due to the behavior of the albuminoids, but very little was really known about such substances. It is sufficient to say that no solution was found, and brewmasters remained in ignorance of the cause of the precipitation which rendered beer unstable and sensitive to cold. The chemical action is still unknown, but the problem of producing chill-proof and stable beer has been solved by the complainants.

The patents in suit produce chill-proof and stable beer by adding to the beer at the proper stage a minute quantity of a proteolytic enzym active in an acid medium. Proteolytic enzyms are divided into classes according to the medium in which they act, that is, whether acid, neutral, or alkaline. The patents in suit refer to four proteolytic enzyms active in acid medium; pepsin, an animal enzym obtained from the stomach of pigs; papain, an enzym derived from the pawpaw; bromelin, a vegetable enzym derived from the pineapple, and malt peptase, derived from malt. Enzyms suitable for the purpose described are widely distributed in the vegetable and animal kingdom, and are readily prepared in concentrated form by known methods.

The procedure by which proteolytic enzyms active in an acid medium are

employed for the purpose of chill-proofing and stabilizing beer is exceedingly simple, and is specifically set forth in the patents in suit: "According to the present process, there is added to the beer at any suitable stage of the brewing, that is to say, at any period subsequent to the cooling of the wort, and usually after the conclusion of the main fermentation, a proportion of proteolytic enzyms active in slightly acid media sufficient to modify the proteids contained in the beer in such manner that they will not be precipitated upon chilling subsequent to pasteurization, the beer being rendered chill-proof in the sense that it is capable of remaining brilliant even when kept upon ice for a considerable time. In practice it has been found advantageous in most cases to add the enzyms to the clarified beer shortly before bottling. During the pasteurization which follows the bottling, the enzyms become active, and those proteids which would cloud the beer when chilled are so modified by the proteolysis that the resulting beer will remain clear and brilliant, being no longer sensitive to cold."

The patents point out specifically that as a general rule: "An enzym, exhibiting an activity of $1/6000$, may be employed in the proportion of 1 to 5 grams per barrel of 31 gallons of beer or ale, the proportion being increased or diminished according as the activity of the preparation may vary from the above standard, and according to the percentage of coagulable albuminoids contained in the beer."

The patents further state that care should be taken not to employ an excessive amount of enzym, as "the addition of the enzym preparation in excessive proportions may render the beer again sensitive to cold." The reason why the enzyms are to be added after the wort has been boiled and cooled is because such enzyms are destroyed at temperatures around 168° F. The record shows that the usual temperature for the pasteurization of beer is from 140 to 145° F. at which temperature the enzyms are active. The patent makes it very clear that the enzyms used should be "such as are not destroyed or rendered permanently inactive by subjection to the usual temperatures of pasteurization."

The precise chemical action of proteolytic enzyms on proteins is complex and not fully understood. It is unimportant, for the purposes of this case, to examine the various theories. The material consideration is that it is an undisputed fact that proteolytic enzyms active in an acid medium, when added to beer in proper quantity at the proper stage of the brewing process, render the beer chill-proof and stable. The evidence shows abundant recognition of the scientific discovery made by the complainants, and its extensive use is proof of its utility.

The patents in suit make it clear that the invention relates to the manufacture of lager beers and brilliant ales, such beers and ales alone being injuriously affected by the haziness or turbidity produced by chilling or by long keeping at ordinary temperatures. The specifications of the two patents are identical: the claims were originally included in one application, and were made in separate applications by direction of the Patent Office. Claim 1 of patent No. 995,820 covers a beer or ale which is stable and chill-proof after pasteurization, these qualities having been produced by the addition to the beer at the proper stage of the brewing process of proteolytic enzyms active in an acid medium. Claims 2 and 3 of this patent cover the process of producing the beer or ale of claim 1, which consists in adding to the beer subsequently to the cooling of the wort a proteolytic enzym which is active in a slightly acid medium in the proper proportions to effect the result described. These two claims differ from each other only in that claim 3 includes the step of pasteurizing which is not specifically set forth in claim 2. Patent No. 995,824 covers a process which is specific to the generic process of the other patent. The two claims in issue cover the art of producing a chill-proof and stable beer by adding before bottling a proteolytic enzym derived from the gastric secretions of mammals, i. e., as the specification makes clear, pepsin. These two claims differ only that claim 2 includes the step of pasteurizing.

Since the evidence satisfies me beyond any reasonable doubt that the defendant's beer is made chill proof and stable by the use of proteolytic enzyms active in acid medium, and that the infringement is a deliberate and flagrant

appropriation of Wallerstein's disclosures, attention may be directed at once to the grounds upon which the validity of the patent is attacked.

The defendant introduced much testimony to show that certain extracts have long been made by compounding pepsin with malt liquor, the latter serving as a carrier for the former. It may be said at the outset that the defendant's testimony with respect to these malt preparations is wholly unsatisfactory. The testimony of the defendant's witness Wyatt was obviously unreliable; its counsel stated upon the argument that it would not be relied upon. The testimony as to the use of pepsin in these preparations is singularly conflicting, and in most cases without corroboration from persons whose knowledge must obviously have been superior to that of the witness testifying. It is unnecessary, however, to examine this testimony in detail because the malt extracts set up by the defendant do not relate to the art of chill-proof beer and are not relevant. The specifications expressly distinguish the lager beers and brilliant ales with which the patents are concerned from medicinal preparations such as malt extracts. Malt extracts are not beverages, nor are they drunk as such; they are tonics, taken in prescribed doses. They are heavy, dark-colored liquids, in which stability cannot be observed, and in which, moreover, since they are not iced, haziness or cloudiness due to icing does not occur. Even if the proof with respect to the use of pepsin in these malt extracts were clear and convincing, it would not constitute a defense to the patent in suit. The pharmaceutical art is remote from the art of brewing, and so far as pepsin may be used in such tonics it is used for a different purpose and with different results. Moreover, on any assumption of relevancy or sufficiency of proof the malt extracts or tonics referred to disclose mere accidental results of the use of pepsin, and cannot anticipate the patents in suit. If it be accepted as proven that pepsin was used with malt liquors having some of the characteristics of beer, although specially brewed for a different purpose, it is clear that such use did not give to the world the knowledge that Wallerstein gave. Brewers remained in ignorance of a method of making chill-proof and stable beer. They derived no more benefit or knowledge from the use of pepsin in tonics than from the use of pepsin in chewing gum.

Nor does the use of diastase to cure starch turbidity suggest the invention of the patents in suit. Beer brewed either by faulty mashing processes or from inferior malt is likely to contain unconverted starch, or, in other words, to exhibit starch turbidity. With proper malt and correct mashing the diastase, or amylolytic enzym, in the malt converts the starch into sugar and dextrin during the brewing processes. It has long been known to brewers that the use of additional diastase in the form of a watery extract of malt will convert starch. The additional diastase accomplishes what sufficient diastase in the malt would have accomplished. During the decade or more in which brewers have been searching for a method of making chill-proof and stable beer, this well-known use of diastase or amylolytic enzym failed to suggest a solution of the problem. All brewers knew that starch turbidity was due to unconverted starch in improperly brewed beer, but no one knew what caused the haziness or cloudiness in properly brewed beer after icing, or what made it unstable after prolonged keeping. A further objection to the defendant's contention is that there seems to be no chemical analogy between proteins and starch. It is known that an amylolytic enzym or diastase converts starch into sugar and dextrin, but it is not known, as I understand it, what the action of a proteolytic enzym on proteins is.

At the close of its testimony the defendant offered in evidence the Breker British patent No. 1884 of 1908, and amended its answer to include it. I understand this patent to relate, not to the production of a chill-proof and stable beer, but to the treatment of the mash from which the wort is prepared. It has long been known that malt contains a proteolytic enzym which becomes active during the malting and mashing processes. The action of this enzym is referred to in the handbooks of brewing as a peptonizing action, and is not original with Breker. The Breker patent has no relation to finished beer, and has no bearings upon the treatment of finished beer to render it stable. Breker boils the wort after his treatment, which destroys the proteolytic enzyms. It appears, moreover, from the file wrapper of patent No. 995,-

820, that an extract of malt such as Breker describes will not make beer chill-proof.

Finally, it is contended that the patents are indefinite and uncertain. But the witnesses—brewers familiar with the art and its processes, the persons to whom the specification is addressed—made no complaint on this score. The terms "chill-proof" and "stable" unquestionably conveyed a definite meaning to their minds.

The defendant seems to have found no difficulty in applying the disclosure of the patent so as to attain the desired result. The specification simply directs that to a barrel of 31 gallons of beer a proteolytic enzym must be added, and it must be added after the main fermentation, or at least after the boiling of the wort, because boiling temperatures destroy the enzym. The patents give the general rule that an enzym exhibiting an activity of $1/6000$ may be employed in the proportion of one to five grams, the preparation being increased or diminished according as the activity of the preparation may vary from the above standard, and according to the percentage of coagulable albuminoids contained in the beer. And the further direction is given that excessive quantities must not be used, since that would render the beer again sensitive to cold. The chill-proof and stable product is produced by specified means, and if the defendant or others find that this product is or may be attained by other independent means, they are free to practice them.

My conclusion is that the patents in issue are valid and infringed. The complainants may have the usual decree.

W. M. Stockbridge, of New York City, for appellant.

J. Q. Rice, of New York City, for appellees.

Before COXE and WARD, Circuit Judges, and MAYER, District Judge.

PER CURIAM. Decree affirmed on the opinion of Judge Veeder.

---

### WALLERSTEIN et al. v. CHRISTIAN FEIGENSPAN, Inc.

(Circuit Court of Appeals, Third Circuit. June 8, 1914.)

No. 1844.

1. PATENTS (§ 327\*)—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION—EFFECT OF PREVIOUS ADJUDICATION.

In the interest of uniformity of decision among the circuits, it is desirable to give much weight to the decision of a co-ordinate court as to the validity of a patent, especially on a motion for a preliminary injunction.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 620–625; Dec. Dig. § 327.\*]

2. PATENTS (§ 328\*)—VALIDITY AND INFRINGEMENT—PROCESS OF TREATING BEER.

A preliminary injunction directed against infringement of the Wallerstein patents No. 995,820, for beer and method of preparing same, and No. 995,824, for method of treating beer or ale, on a prior decision in another circuit sustaining the patents.

Appeal from the District Court, of the United States for the District of New Jersey; John Rellstab, Judge.

Suit by Max Wallerstein and Leo Wallerstein against Christian Feigenspan, Incorporated. From an order denying a motion for preliminary injunction, complainants appeal. Reversed.

---